UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
NORTHERN DIVISION

| | |
|---|---|
| BRANDY M. SEVERNS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 2:16 CV 48 DDN |
| ) | |
| NANCY A. BERRYHILL,[1] ) | |
| Acting Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM

This action is before the court for judicial review of the final decision of the Commissioner of Social Security that the plaintiff, Brandy M. Severns, is not disabled under Title II or Title XVI of the Social Security Act and thus not entitled to disability insurance benefits ("DIB"), 42 U.S.C. §§ 401 et seq., or supplemental security income ("SSI"). 42 U.S.C. §§1381-1383(f). The parties have consented to the exercise of plenary authority by the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). For the reasons set forth below, the decision of the Commissioner is affirmed.

## I.  BACKGROUND

Plaintiff was born on June 2, 1973. (Tr. 163). She filed applications for DIB and SSI in March 2013. (Tr. 163-76). She alleged an onset date of August 1, 2010, claiming disability based on degenerative disk disease, restless leg syndrome, non-malignant endometrian disease, depression, back issues, pain throughout body, hyperthyroidism,

---

[1] Nancy A. Berryhill is now the Acting Commissioner of Social Security. Pursuant to Federal Rule of Civil Procedure 25(d), she is substituted in her official capacity for Carolyn W. Colvin as the defendant in this suit. 42 U.S.C. § 405(g) (last sentence).

and high blood pressure. (Tr. 229). These initial applications were denied on May 20, 2013, and she requested a hearing before an administrative law judge ("ALJ") in June 2014. (Tr. 104-19). Plaintiff appeared before the ALJ on January 28, 2015. (Tr. 29). On February 27, 2015, the ALJ determined that plaintiff was not disabled. (Tr. 14-24).

Plaintiff appealed the ALJ's decision, and the Appeals Council denied her request for review on May 17, 2016, making the decision of the ALJ the final decision of the Commissioner of Social Security. (Tr. 1-5).

**A.     Medical Record**

On August 15, 2011, Plaintiff was evaluated by physical therapist Jennifer Hu, DPT. (Tr. 277-78). Dr. Hu opined that plaintiff was able to perform functional tasks while walking, standing, and sitting; was able to reach overhead without difficulty; was unable to squat due to fear of losing balance; and was unable to bend forward to touch the floor. (Tr. 277). She also found plaintiff able to perform light lifting of less than or equal to 10 pounds. (Tr. 277).

On November 30, 2011, plaintiff began treatment with Hope Tinker, MD, and Leann Williams, Family Nurse Practitioner-BC, for cervical motion tenderness and dysfunctional uterine bleeding. (Tr. 279-80).

On March 19, 2012, she saw Courtney Barr, MPH, MD, for heavy vaginal bleeding. (Tr. 319). Dr. Barr diagnosed plaintiff with menorrhagia, and treatment options were discussed with her including ablation procedures, IUDs, a hysterectomy, and hormone injections. (Tr. 322). Plaintiff decided to consider options elsewhere before making a decision. (Tr. 322).

From February 12, 2013 to August 5, 2013, Dr. Tinker and Nurse Practitioner Williams treated plaintiff for hypertension, back pain, hypothyroidism, elbow pain, menorrhagia, chest pain, high blood pressure, and depression. (Tr. 376-81). The treatment plan discussed included prescriptions of Narflex, Paxil, and Lisinopril along with an elbow strap and ice. (Tr. 376-81).

On May 4, 2013, plaintiff saw Dennis Velez, MD, for a consultative examination. (Tr. 337-43). Plaintiff was tender to palpation of the lumbosacral spine, with limited range of motion. (Tr. 342). However, Dr. Velez did not find any limitations in her ability to sit, stand, walk, lift, or carry. (Tr. 342). He also did not find plaintiff to have any manipulative limitations or verbal or written communication problems. (Tr. 342).

On May 28, 2013, plaintiff complained of back and lumbar pain at an urgent care clinic. (Tr. 413-18). She had a lumbosacral spine x-ray that revealed mild lumbar spondylosis. (Tr. 417). Keith Groh, MD, recommended that she follow up with a neurosurgery clinic as needed. (Tr. 416).

On June 6, 2013, on referral from Dr. Groh, plaintiff was evaluated by Thorkild Norregaard, MD, at the University of Missouri Neurosurgery Clinic, with back pain and left-sided radicular leg symptoms. (Tr. 388-91). Dr. Norregaard diagnosed her with neurogenic claudication, lumbago, left lower extremity radiculopathy, and new-onset seizures. (Tr. 391). He recommended an MRI of the lumbar spine on suspicion of degenerative disc disease and possible neuro foraminal stenosis. (Tr. 391). A week later, plaintiff had an MRI and was examined by Kimberly McBride Johnson, PA, who did not find significant disc abnormality and recommended that she continue conservative management with Naproxin and Flexeril. (Tr. 393).

On October 18, 2013, plaintiff returned to the urgent care clinic reporting back and right hip pain due to a fall two weeks prior. (Tr. 420). She was prescribed acetaminophen-hydrocodone and prednisone. (Tr. 419-22).

On December 15, 2013, plaintiff was examined at the Missouri Orthopaedic Institute by Mark Drymalski, MD. (Tr. 395). Dr. Drymalski reviewed plaintiff's MRI and found multi-level degenerative disc disease, slight-to-moderate decreased disc space height, mild foraminal stenosis bilaterally at L5-S1, broad based disc bulge at L4-5, and central disc protrusion at L5-S1. (Tr. 397). Dr. Drymalski prescribed a Gabapentin titration for chronic pain, Robaxin, and recommended referrals as necessary. (Tr. 398). He also recommended avoiding opioids for chronic pain. (Tr. 398).

3

On February 26, 2014, plaintiff saw Rick Bonnette, DO, at Family Health Care for decreased back mobility. (Tr. 351-53). Dr. Bonnette determined that plaintiff could only forward flex 45 degrees before experiencing pain. (Tr. 351). He advised plaintiff to continue taking previously-prescribed medication, to lose weight, and to quit smoking. (Tr. 352).

On May 8, 2014, plaintiff had a follow-up appointment with Dr. Drymalski for her chronic back pain and right leg pain. (Tr. 399). Dr. Drymalski prescribed Flexeril, a continuation of Gabapentin, and a referral for stress urinary incontinence. (Tr. 401).

Plaintiff saw Dr. Bonnette again on June 10, 2014, for a swollen and painful neck. (Tr. 363). He refilled her prescription of Bactrim and recommended continuing a muscle relaxer, Mobic. (Tr. 367). He also advised plaintiff to sleep with her neck supported in a neutral position, try some neck exercises, and use moist heat on the affected area. (Tr. 367). Dr. Bonnette also suggested plaintiff get x-rays of her cervical spine and see pain management doctors. (Tr. 367).

On July 22, 2014, plaintiff saw Christopher O'Connell, MD, at the University of Missouri Health Care Psychiatry Clinic for an initial depression and anxiety evaluation. (Tr. 402). Dr. O'Connell found that plaintiff had symptoms suggestive of anxious depression and prescribed her Zoloft, Trazodone, and Xanax. (Tr. 405).

The same day, plaintiff was treated at the urgent care clinic for knee pain after another fall. (Tr. 423). The doctors ordered an x-ray, prescribed Norco for the pain, and instructed her to ice her knee and wear a knee brace. (Tr. 425).

On July 31, 2014, plaintiff returned to the Missouri Orthopaedic Institute for a follow-up with regard to her chronic low back and right leg pain. (Tr. 406). Dr. Drymalski ordered an x-ray of her right knee and recommended she continue taking Flexeril, Mobic, and Gabapentin. (Tr. 408). Dr. Drymalski noted plaintiff was "continu[ing] to do well from a medication standpoint." (Tr. 406).

On September 2, 2014, plaintiff had a follow-up appointment with Dr. O'Connell for anxiety and depression on September 2, 2014. (Tr. 410). Dr. O'Connell increased her Zoloft and Trazodone prescriptions. (Tr. 412). He observed that plaintiff had normal

4

cognition, memory, language, and fund of knowledge. (Tr. 411). He noted that her symptoms were improving and she was open to increased medication and therapy. (Tr. 411).

In January 2015, Dr. O'Connell wrote a letter stating that he had been plaintiff's doctor since July 2014 and that her diagnoses were Major Depressive Disorder, Panic Disorder with Agoraphobia, and Generalized Anxiety Disorder. (Tr. 427). The letter explained that plaintiff's disorders may be aggravated by triggers, including stress and physical pain, and that plaintiff was impaired to return to work. (Tr. 427).

In January 2015, Dr. Drymalski submitted a Physician's Assessment form confirming plaintiff's diagnoses of failed back syndrome, right SI joint pain, and lumbar spondylosis. (Tr. 428). He noted that plaintiff can sit for one hour at a time before needing to get up, and stand 30 minutes at a time before needing to sit down. (Tr. 429). Further, he noted that he "would not expect chronic back pain to affect punctual [work] attendance." (Tr. 430). He clarified this letter six months later, in August 2015, after the ALJ's decision, writing that plaintiff may experience flares in pain a few days a month, but should be able to maintain a punctual work schedule. (Tr. 431).

### B. <u>ALJ Hearing</u>

Plaintiff appeared and testified before an ALJ on January 28, 2015. (Tr. 29-55). She testified that she no longer works because of problems with her back. (Tr. 36). She stopped working in March of 2010 because of her back pain and has not worked or done any volunteer work since. (Tr. 36). Within the past 15 years, plaintiff worked as a cashier-checker, housekeeper, assistant manager, CNA, and inspector of computer parts. (Tr. 36-37). She testified that she is no longer able to work because she cannot sit without having to "constantly try to move to get comfortable" and cannot stand for more than 15 minutes without experiencing back pain. (Tr. 39). She further testified that when she experiences back pain from standing for too long, it is an aching pain that eventually causes her to "start shaking." (Tr. 39). She typically has to sit in a recliner and keep her

"legs propped up with a pillow under them" to sit comfortably, and has to move back and forth between the couch and recliner. (Tr. 39).

Plaintiff testified she was seeing doctors for back pain treatment and anxiety. (Tr. 39). Two of the medications she takes, Flexeril and Xanax, reportedly make her "loopy," and Flexiril makes her tired. (Tr. 40). She also testified that she has muscle spasms in her left leg, which cause constant numbness, and she is only able to sleep 2 hours at most before having to get up. (Tr. 41-42).

On a typical day, plaintiff's husband helps her get up in the morning, and she spends most of the day lying down or sitting in the recliner. (Tr. 40). She testified that she tries to do chores around the house, such as cooking or cleaning up the kitchen, but usually has to sit on a stool, and cannot do so for very long before her back begins to hurt. (Tr. 40-41).

Plaintiff testified that she has become depressed because of her inability to do many things. (Tr. 40). She stated that she depends on her oldest daughter to come home from college on the weekends to help plaintiff's husband cook and freeze meals for the coming week, since she is unable to stand long enough to cook. (Tr. 40). Further, plaintiff testified that she has not driven a car in several months because her back pain prevents her from being able to turn around to see behind her, and plaintiff is scared to drive while taking the medication she is prescribed. (Tr. 35). Plaintiff stated that she was able to sit in a car for an hour and twenty minutes to get to her ALJ hearing. (Tr. 35). Plaintiff also testified that she smokes occasionally. (Tr. 46).

## C.   **Decision of the ALJ**

On February 27, 2015, the ALJ issued a decision concluding that plaintiff is not disabled under the Act. (Tr. 14-24).

In adhering to the five-step sequential evaluation process established by the Social Security Act, the ALJ determined at Step One that plaintiff had not engaged in substantial gainful activity ("SGA") throughout the relevant period, beginning on October 19, 2012. (Tr. 16). At Step Two, the ALJ found that plaintiff has the severe impairments of status

post discectomy with lumbar spondylosis and radiculopathy, degenerative disc disease of the lumbar spine at multiple levels, arthritis of the right knee, urinary incontinence, major depressive disorder, panic disorder without agoraphobia, and generalized anxiety disorder. (Tr. 16).

At Step Three, the ALJ concluded that although plaintiff's impairments are all supported by medically acceptable evidence in the record, the impairments do not alone or in combination meet or medically equal the severity of any impairments listed in 20 CFR Part 404, Subpart P, Appendix 1. (Tr. 17).[2] The ALJ noted that plaintiff's attorney specifically said at the hearing that plaintiff's impairments do not meet or equal the criteria for a listing. (Tr. 17).

Even though plaintiff does not have impairments that meet or equal a listing, the ALJ was careful to assess plaintiff's alleged mental impairments with regard to "paragraph B" criteria. (Tr. 17). Specifically, the ALJ found that plaintiff's depression limits her ability to concentrate and persist on tasks, and that her anxiety and panic attacks restricts her ability to interact with people. (Tr. 17). With all of these considerations, the ALJ determined that plaintiff is unable to perform complex or detailed tasks, and has a limited ability to interact with the public and co-workers. (Tr. 17). However, plaintiff's mental condition did not meet "paragraph B" criteria because it did "not cause at least two 'marked' limitations or one 'marked' limitation and 'repeated' episodes of decompensation, each of extended duration." (Tr. 17). The ALJ also found that plaintiff's condition fails to meet "paragraph C" criteria. (Tr. 17).

At Step Four, the ALJ determined that plaintiff has the RFC to perform sedentary work as defined in 20 C.F.R. §§.404.1567(a), 416.967(a), and SSR 83-10. (Tr. 18). Specifically, plaintiff can lift and carry up to 10 pounds; must alternate between standing and sitting at 30-minute intervals; can stand or walk for a total of two hours and sit for six hours in an eight-hour work day; can climb ramps and stairs occasionally; cannot climb ladders, ropes, or scaffolds; cannot balance, kneel, crouch, or crawl; should avoid

---

[2] For plaintiff to meet an impairment in Listing 1.04, she would need to have a spinal disorder that compromises the nerve root or spinal cord. Plaintiff has no such impairment.

7

overhead reaching, excessive vibration, operation of moving machinery, unprotected heights, and hazardous machinery; should avoid exposure to extreme cold and heat; is limited to simple, routine, and repetitive tasks; should have no public interaction; and can work around co-workers but only have occasional interaction with co-workers. (Tr. 18).

With regard to Jennifer Hu's physical therapy evaluation of plaintiff, the ALJ gave the report some weight, in finding that plaintiff does have some deficits that are "not to the point of [being] disabling," (Tr. 18), even though Hu, as a physical therapist, is a non-acceptable medical source according to Social Security Regulations. (Tr. 71).

The ALJ did not agree with Dr. Velez's assessment, who conducted a consultative examination of plaintiff and concluded that plaintiff has no exertional limitations. (Tr. 19). Dr. Velez found that plaintiff's impairments are mild, such that she has no limitations at all. (Tr. 19). The ALJ credited Dr. Velez's observations about plaintiff's ability to reach and his opinion that she had full strength, but found that other credible evidence outweighed Dr. Velez's opinion that plaintiff had no exertional limitations. (Tr. 19). Accordingly, the ALJ gave it only some weight. (Tr. 18-19).

The ALJ took note of several follow-up examinations at the University of Missouri Health Care, where doctors recommended that plaintiff stop smoking. (Tr. 19). She did not. (Tr. 19). The ALJ inferred that the plaintiff's "choice to continue to smoke suggests that she has no interest in reducing her alleged symptoms or the progression of her diseases." (Tr. 20). The ALJ also recognized that plaintiff has a history of back problems that have been treated conservatively. (Tr. 18).

With regard to Dr. Drymalski's examination of plaintiff, the ALJ considered it to be sound and deserving of significant weight. (Tr. 20). Dr. Drymalski confirmed plaintiff's assertions of back pain and weakness, and opined that she would need to change positions every 30 minutes, could only walk 3 or 4 blocks at a time, and could lift up to 20 pounds frequently and 10 pounds constantly. (Tr. 20). However, the ALJ found Dr. Drymalski's statement that he expected plaintiff to miss work 3 times a month unsupported by the medical record and the doctor's own report. (Tr. 20). Thus, with the exception of the work absence expectation, the ALJ gave Dr. Drymalski's evaluation

significant weight and considered it conclusive of the plaintiff being capable of light and sedentary type work. (Tr. 20).

With respect to plaintiff's mental impairments (depression, anxiety, and panic disorder), the ALJ noted that plaintiff received little treatment for them until 2014, when she was prescribed a new medical regime at the University of Missouri Health Care. (Tr. 20). The ALJ did not affirm the conclusions of Dr. Smith at the University of Missouri Health Care that the plaintiff has no severe mental impairments. (Tr. 20-21). Instead, the ALJ found that plaintiff does indeed have some mental impairments. (Tr. 21). A later evaluation by Dr. Bhardwaj diagnosed plaintiff with depression, anxiety, and a panic disorder. (Tr. 21).

The ALJ gave Dr. O'Connell's opinion little weight. Dr. O'Connell opined that plaintiff's physical health was "exacerbating" to her mental health, such that she would be limited in performing efficiently in the work force. (Tr. 21). On the basis of medical evidence, the ALJ found that plaintiff's mental condition was more stable and manageable than portrayed by Dr. O'Connell. (Tr. 21).

Last, at Step Five, the ALJ found that jobs exist in significant numbers in the national economy that a person of plaintiff's RFC, age, education, and work experience could perform. (Tr. 22). The ALJ enlisted the testimony of a VE, who testified that a hypothetical individual with plaintiff's age classification, education, work experience, and RFC would be capable of performing the work required of sedentary occupations in the national economy, such as document scanner, electronics assembler, and packager. (Tr. 23).

Thus, the ALJ concluded that plaintiff is not disabled under the Act, and therefore not entitled to DIB or SSI. (Tr. 23).

## II. DISCUSSION

Plaintiff argues the ALJ's decision fails to properly weigh medical opinions from treating sources and fails to properly formulate her residual functional capacity ("RFC"). The court disagrees.

## A. Standard of Review and Statutory Framework

The Social Security Act permits an individual to obtain review of the final decision of the Commissioner of Social Security. Such review is limited to whether the decision of the Commissioner is supported by substantial evidence on the record as a whole. *See Milam v. Colvin*, 794 F.3d 978, 983 (8th Cir. 2015). If a decision is supported by substantial evidence on the record as a whole, then the court must affirm. *Id.* Similarly, a court will not reverse the decision simply because some evidence on the record supports a contrary outcome. *See Andrew v. Colvin*, 791 F.3d 923, 928 (8th Cir. 2015). If two inconsistent conclusions can be drawn from the record, and the Commissioner has adopted one of them, the court must affirm. *See Cypress v. Colvin*, 807 F.3d 948, 950 (8th Cir. 2015).

The Commissioner has established a five-step sequential evaluation process to determine whether a plaintiff is disabled under the Act. 20 C.F.R. § 404.1520. At Step One, the Commissioner must determine whether the plaintiff has engaged in any substantial gainful activity throughout the relevant period. If the plaintiff is engaging in substantial gainful activity, then benefits are denied; if she has not, then the evaluation process continues. At Step Two, the Commissioner must determine whether the plaintiff suffers from medically determinable impairments, or a combination of impairments, which are "severe." 20 C.F.R. § 404.1520(c). An impairment is severe if it significantly limits a plaintiff's physical or mental ability to do basic work activities. 20 C.F.R. § 404.1521(a).

At Step Three, the Commissioner must determine whether any severe impairment meets, or medically-equals, the severity of one of the Commissioner's list of disabling impairments. If the answer at Step Three is in the negative, at Step Four the Commissioner determines what the plaintiff's RFC is by considering relevant medical and other evidence, such as medical reports, examinations, and descriptions of the plaintiff's limitations by the plaintiff and others. 20 C.F.R. § 404.1545(a)(3). The Commissioner then uses the plaintiff's RFC to decide whether she is able to perform past

relevant work (PRW); if she is unable to, then the Commissioner proceeds to Step Five. At Step Five, the burden of proof shifts to the Commissioner to show that the plaintiff possesses the RFC to perform substantial gainful activity in the national economy consistent with her age, education, and work experience. If this is established, plaintiff is ruled not disabled.

B.    <u>**ALJ Evaluation of Treating Sources**</u>

Plaintiff first claims that (1) the Commissioner improperly evaluated the treating sources' opinions and (2) was required but failed to contact plaintiff's treating physicians for additional evidence or clarification before issuing her opinion.

It is the function of the ALJ to weigh conflicting evidence and to resolve disagreements among physicians. *See Cline v. Colvin*, 771 F.3d 1098, 1103 (8th Cir. 2014). In assessing a medical opinion, an ALJ may consider factors including the length of the treatment relationship and the frequency of examination, the nature and extent of treatment relationship, supportability with relevant medical evidence, consistency between the opinion and the record as a whole, the physician's status as a specialist, and any other relevant factors brought to the attention of the ALJ. *See* 20 C.F.R. §§ 404.1527(c)(1)-(6); 416.927(c)(1)-(6). The opinions of treating physicians are generally given controlling or at least substantial weight, unless clearly unsupported by and inconsistent with other substantial evidence. 20 C.F.R. §§ 404.1527, 416.927; *Prosch v. Astrue*, 201 F.3d 1010, 1012-13 (8th Cir. 2012).

Plaintiff appears to refer to Drs. Velez, O'Connell, and Drymalski as treating sources. According to the regulations, a "treating source" is an acceptable medical source that has provided a claimant with "medical treatment or evaluation" and who has had "an ongoing treatment relationship" with the claimant. 20 C.F.R. § 404.1527(a)(2).

> Generally, we will consider that you have an ongoing treatment relationship with an acceptable medical source when the medical evidence establishes that you see, or have seen, the source with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for your medical condition(s). We may consider an acceptable

medical source who has treated or evaluated you only a few times or only after long intervals (e.g., twice a year) to be your treating source if the nature and frequency of the treatment or evaluation is typical for your condition(s).

20 C.F.R. § 404.1527(a)(2). The regulations value treating sources because they provide "a detailed, longitudinal picture of [a claimant's] medical impairment(s)" and offer insights "that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations." 20 C.F.R. § 404.1527(c)(2). The regulations do not explicitly define the number of examinations it takes for a source to obtain this longitudinal picture, but state merely that "the longer a treating source has treated [a claimant] . . . the more weight we will give to the source's medical opinion." *Id.* at § 404.1527(c)(2)(i).

Guided by these principles, Drs. Velez and O'Connell cannot be considered treating sources. Plaintiff met with Dr. Velez a single time, for the purpose of a consultative examination. (Tr. 337-43). Plaintiff met with Dr. O'Connell twice: once for an initial psychiatric evaluation, on July 22, 2014, and once for a single follow-up visit six weeks later, on September 2, 2014. (Tr. 402, 410). A total of two visits occurring within the span of a month and a half develops a very limited longitudinal picture of plaintiff's mental health impairment. Even if Dr. O'Connell was a treating physician, the ALJ could properly discount his opinion, because his opinion that plaintiff was "impaired to return to work" is an opinion on an issue reserved to the Commissioner, and it was contradicted by his clinical notes stating plaintiff was "stable and manageable" and had a Global Assessment Functioning score of 55.[3]

However, the characterization of Dr. Drymalski's treatment relationship is a closer question. Plaintiff met with Dr. Drymalski three times. (Tr. 395-401, 406-08). His examination records note that he initially saw plaintiff on referral from Dr. Eric Gross in

---

[3] A GAF score of 55 indicates only moderate symptoms and does not support a finding of disability. *See Halverson v. Astrue*, 600 F.3d 922, 930-31 (8th Cir. 2010) (finding GAF scores between 52 and 60 were consistent with moderate limitations).

December 2013, for a consultation on plaintiff's back and leg pain. (Tr. 395, 398). Dr. Drymalski instructed plaintiff to follow up in 2 months, or sooner as needed. (Tr. 398). Dr. Drymalski's second examination of plaintiff, in May 2014, was on plaintiff's self-referral, again for treatment of her back pain and leg pain, and plaintiff was instructed to follow up with him in 3 or 4 months, or as needed. (Tr. 399, 401). Plaintiff's third and final visit with Dr. Drymalski, in July 2014, was on referral from Dr. Rick Bonnette, her primary care provider, for treatment of her back and knee pain. (Tr. 406). At that time, Dr. Drymalski ordered an x-ray of plaintiff's knee and instructed her to follow up with him again in 3 or 4 months. (Tr. 408-09).

Although his treatment of plaintiff was somewhat infrequent, the court considers Dr. Drymalski to be a treating source, because the total length of time of the treatment relationship – approximately one year – was substantial. (Tr. 398, 401, 408).

The ALJ nevertheless did not legally err in discounting part of Dr. Drymalski's opinion, even as a treating source opinion. The opinion of a treating physician only controls if it is well supported by medically acceptable diagnostic techniques and is not inconsistent with the other substantial evidence. 20 C.F.R. §§ 404.1527 and 416.927; *Prosch v. Astrue*, 201 F.3d at 1012-13.

Dr. Drymalski submitted a Physician's Assessment form confirming plaintiff's diagnoses of failed back syndrome, right SI joint pain, and lumbar spondylosis. (Tr. 428). He opined that plaintiff can lift 20 pounds frequently and 10 pounds on a constant basis; can stand or walk 2 hours and sit for at least 6 hours per 8-hour workday; can sit for one hour at a time before needing to get up; can stand for 30 minutes at a time before needing to sit down; can change positions every hour; and can twist, stoop, crouch, and climb on an occasional basis. (Tr. 429-30). Although he stated he did not expect plaintiff's back pain to affect her punctual work attendance, he opined that on average she might miss work three times a month. (Tr. 430).

The ALJ rejected Dr. Drymalski's opinion that plaintiff would be absent from work due to her conditions three times per month. (Tr. 20, 430). She noted that his opinion on this issue was not supported by the record evidence, including Dr.

13

Drymalski's own opinion that he "would not expect chronic back pain to affect punctual [work] attendance." (Tr. 20, 430). Dr. Drymalski had only met with plaintiff on three occasions, and his treatment notes from those occasions do not indicate that he had sufficient knowledge upon which to formulate an opinion as to plaintiff's rate of absence. Dr. Drymalski never treated plaintiff while she was employed and his treatment notes do not provide any evidence that he asked plaintiff about any prior absenteeism or her current ability to maintain employment. (Tr. 395-401, 406-09). The ALJ properly discounted this portion of Dr. Drymalski's opinion as not supported by the medical record, including Dr. Drymalski's own report. She properly gave significant weight to the remainder of his opinion. (Tr. 20).

However, because of the value of a treating source opinion, even if it is not entitled to controlling weight, it still should not ordinarily be disregarded and remains entitled to substantial weight. *Singh v. Apfel*, 222 F.3d 448, 452 (8th Cir. 2000). The ALJ accordingly gave significant weight to the majority of Dr. Drymalski's opinion. (Tr. 20). In determining plaintiff's RFC, the ALJ adopted most of Dr. Drymalski's limitations outright, and where she did not, she generally restricted them further: she reduced Dr. Drymalski's limitations on plaintiff's lifting capacity from 20 to 10 pounds and reduced the time for changing positions from every hour to every half hour. (Tr. 18).

Plaintiff also argues that the ALJ should have contacted Dr. Drymalski to clarify his opinion on plaintiff's work attendance. (Doc. 23 at 13-14) (citing 20 C.F.R. § 404.1512(e). The regulations do not require the ALJ to recontact a treating source whose opinion is refuted by the record or the treating source's own opinions elsewhere. *Hacker v. Barnhart*, 459 F.3d 934, 938 (8th Cir. 2006). *See also* 20 C.F.R. §§ 404.1520b(b), 416.920b(b). "This is especially true when the ALJ is able to determine from the record whether the applicant is disabled." *Hacker*, 459 F.3d at 938. If the evidence in the case is inconsistent, in that it contains an internal conflict, as here, the ALJ may still consider the relevant evidence and determine whether the claimant is disabled based on the evidence she has. *See* 20 C.F.R. §§ 404.1520b(b), 416.920b(b). Here, the ALJ was able to reach a decision without obtaining additional medical evidence. She found that Dr.

Drymalski's opinion regarding plaintiff's absences from work to be unsupported by the record. She relied on multiple, detailed opinions, each from examining medical professionals, and she was under no obligation to seek additional evidence or clarification on this point. *See* 20 C.F.R. § 404.1512(e).

C. **RFC Determination**

Second, plaintiff argues that the Commissioner improperly determined her RFC in finding she is not disabled. Specifically, plaintiff argues that the ALJ failed to consider her capacity for work activity "on a regular and continuing basis." (Doc. 23 at 14) (citing 20 C.F.R. § 404.1545).

Work activity on a "regular and continuing basis" means eight hours a day, five days a week, or an equivalent work schedule. 20 C.F.R. § 404.1545(c); SSR 96-8p (1996). Plaintiff argues that just because a treatment note stated she was "doing well" does not mean that she is able to engage in competitive employment on a continuing and regular basis. (Doc. 23 at 14-15) (citing *Gude v. Sullivan*, 956 F.2d 791, 794 (8th Cir. 1992)). She also argues that an ALJ must rely on information from the treating sources in determining plaintiff's ability to work and not draw upon her own inferences. (Doc. 23 at 15) (citing *Nevland v. Apfel*, 204 F.3d 853, 858 (8th Cir. 2000)).

The VE in this case testified that employees are generally given eight hours of sick leave per month. (Tr. 53). The VE also testified that employees are given a 15-minute break in the morning and in the afternoon with a 30- or 60-minute lunchbreak, and exceeding these breaks on a regular basis would eliminate the jobs available to plaintiff. (Tr. 53-54). Plaintiff argues that Dr. Drymalski's statement that plaintiff might require up to three absences per month means she cannot work on a regular and continuing basis. However, there was substantial evidence to discredit this portion of Dr. Drymalski's opinion, including Dr. Drymalski's response to the following prompt:

> Your opinion as to whether you feel your patient could keep a regular work schedule and maintain punctual attendance?

15

I would not expect chronic back pain to affect punctual attendance. (Handwritten).

(Tr. 430). Dr. Drymalski stated the reason he thought plaintiff might miss work three times a month is not because of his professional experience, plaintiff's record of attendance to her appointments, or any other reason, except for her medical condition. (*Id.*).

Plaintiff refers to a second letter submitted by Dr. Drymalski after the ALJ's decision, which explains that plaintiff may have flares in pain a few days a month, but that if she plans ahead and understands her pain and its effects on her day-to-day activities, she should be able to accommodate her pain and maintain a relatively regular schedule. (Tr. 431). Although this letter was written after the ALJ's decision, the Appeals Council explicitly considered it and determined that it did not provide a basis for changing the ALJ's decision. (Tr. 2-5). .

In determining plaintiff's RFC, the ALJ acted within her discretion in resolving conflicts in the record and gave good reasons for the significant functional limitations she found. (Tr. 18-22). The record does not warrant the imposition of any greater limitations. (*Id.*) As discussed above, the ALJ imposed the same limitations recommended by plaintiff's treating physicians, except where she gave plaintiff the benefit of the doubt in imposing even more restrictive limitations. The ALJ determined plaintiff's RFC after considering all relevant medical and other evidence in the record. (Tr. 22-23). The ALJ properly discounted the portion of Dr. Drymalski's opinion about work attendance as not supported by the medical record. She properly gave significant weight to the remainder of his opinion, including his opinion that plaintiff's pain would not affect plaintiff's punctual work attendance. (Tr. 20).

As the ALJ noted, plaintiff's treatment was conservative: no providers recommended back surgery, she reported on several occasions that her conditions improved with treatment, her back pain responded to medication, and she was often noncompliant with the treatment recommended. (Tr. 18-22, 39, 393, 395, 399, 402-05, 410, 412). Additionally, the objective medical evidence did not support the severity of

some of her alleged symptoms, as she had full strength in both arms and legs; full range of motion in her hips, knees, and ankles; an ability to reach overhead; mild findings on MRI scans; normal straight-leg raising; and no knee abnormalities. (Tr. 18-22, 341-42, 393, 397, 425). Plaintiff's activities of daily living also contradicted the level of severity she claimed: she testified her back, hip, and left leg were in constant pain and that she is constantly numb, yet she folds laundry, cleans the table, washes a sink full of dishes at a time, cooks quick dinners for herself and her family, and was able to sit in a car for the 80-minute drive to the administrative hearing without needing to stop. (Tr. 35, 38, 40, 42, 239). Finally, plaintiff's inconsistent work history between the years 1991 and 2010 suggests that her unemployment may be unrelated to her impairments and due instead to other factors. (Tr. 18-22, 197).

There was substantial evidence supporting the ALJ's determination that plaintiff retained the RFC to work, albeit in a very limited and sedentary fashion, on a continuing and regular basis. The ALJ explained her rationale for determining plaintiff's RFC, and this rationale is supported by substantial evidence, so the court defers to her analysis.

## III. CONCLUSION

For the reasons set forth above, the decision of the Commissioner of Social Security is affirmed. An appropriate judgment order is issued herewith.

/s/   David D. Noce<br>
**UNITED STATES MAGISTRATE JUDGE**

Signed on September 6, 2017.